(Slip Opinion)            OCTOBER TERM, 2005            1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ILLINOIS TOOL WORKS INC. ET AL. *v.* INDEPENDENT INK, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 04–1329.   Argued November 29, 2005—Decided March 1, 2006

Petitioners manufacture and market printing systems that include a patented printhead and ink container and unpatented ink, which they sell to original equipment manufacturers who agree that they will purchase ink exclusively from petitioners and that neither they nor their customers will refill the patented containers with ink of any kind.  Respondent developed ink with the same chemical composition as petitioners' ink.  After petitioner Trident's infringement action was dismissed, respondent filed suit seeking a judgment of noninfringement and invalidity of Trident's patents on the ground that petitioners are engaged in illegal "tying" and monopolization in violation of §§1 and 2 of the Sherman Act.  Granting petitioners summary judgment, the District Court rejected respondent's argument that petitioners necessarily have market power as a matter of law by virtue of the patent on their printhead system, thereby rendering the tying arrangements *per se* violations of the antitrust laws.  After carefully reviewing this Court's tying-arrangements decisions, the Federal Circuit reversed as to the §1 claim, concluding that it had to follow this Court's precedents until overruled by this Court.

*Held:* Because a patent does not necessarily confer market power upon the patentee, in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product.  Pp. 3–17.

   (a) Over the years, this Court's strong disapproval of tying arrangements has substantially diminished, as the Court has moved from relying on assumptions to requiring a showing of market power in the tying product.  The assumption in earlier decisions that such "arrangements serve hardly any purpose beyond the suppression of

competition," *Standard Oil Co. of Cal.* v. *United States,* 337 U. S. 293, 305–306, was rejected in *United States Steel Corp.* v. *Fortner Enterprises, Inc.,* 429 U. S. 610, 622 *(Fortner II)*, and again in *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, both of which involved unpatented tying products. Nothing in *Jefferson Parish* suggested a rebuttable presumption of market power applicable to tying arrangements involving a patent on the tying good. Pp. 3–8.

(b) The presumption that a patent confers market power arose outside the antitrust context as part of the patent misuse doctrine, and migrated to antitrust law in *International Salt Co.* v. *United States,* 332 U. S. 392. See also *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488; *United States* v. *Loew's Inc.*, 371 U. S. 38. Pp. 8–10.

(c) When Congress codified the patent laws for the first time, it initiated the untwining of the patent misuse doctrine and antitrust jurisprudence. At the same time that this Court's antitrust jurisprudence continued to rely on the assumption that tying arrangements generally serve no legitimate business purpose, Congress began chipping away at that assumption in the patent misuse context from whence it came. Then, four years after *Jefferson Parish* repeated the presumption that patents confer market power, Congress amended the Patent Code to eliminate it in the patent misuse context. While that amendment does not expressly refer to the antitrust laws, it invites reappraisal of *International Salt*'s *per se* rule. After considering the congressional judgment reflected in the amendment, this Court concludes that tying arrangements involving patented products should be evaluated under the standards of cases like *Fortner II* and *Jefferson Parish* rather than the *per se* rule in *Morton Salt* and *Loew*'s. Any conclusion that an arrangement is unlawful must be supported by proof of power in the relevant market rather than by a mere presumption thereof. Pp. 11–13.

(d) Respondent's alternatives to retention of the *per se* rule—that the Court endorse a rebuttable presumption that patentees possess market power when they condition the purchase of the patented product on an agreement to buy unpatented goods exclusively from the patentee, or differentiate between tying arrangements involving requirements ties and other types of tying arrangements—are rejected. Pp. 14–16.

(e) Because respondent reasonably relied on this Court's prior opinions in moving for summary judgment without offering evidence of the relevant market or proving petitioners' power within that market, respondent should be given a fair opportunity to develop and introduce evidence on that issue, as well as other relevant issues, when the case returns to the District Court. P. 17.

396 F. 3d 1342, vacated and remanded.

Syllabus

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 04–1329

———

## ILLINOIS TOOL WORKS INC., ET AL., PETITIONERS *v.* INDEPENDENT INK, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[March 1, 2006]

JUSTICE STEVENS delivered the opinion of the Court.

In *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2 (1984), we repeated the well-settled proposition that "if the Government has granted the seller a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power." *Id.*, at 16.  This presumption of market power, applicable in the antitrust context when a seller conditions its sale of a patented product (the "tying" product) on the purchase of a second product (the "tied" product), has its foundation in the judicially created patent misuse doctrine.  See *United States* v. *Loew's Inc.*, 371 U. S. 38, 46 (1962).  In 1988, Congress substantially undermined that foundation, amending the Patent Act to eliminate the market power presumption in patent misuse cases.  See 102 Stat. 4674, codified at 35 U. S. C. §271(d). The question presented to us today is whether the presumption of market power in a patented product should survive as a matter of antitrust law despite its demise in patent law.  We conclude that the mere fact that a tying product is patented does not support such a presumption.

I

Petitioners, Trident, Inc., and its parent, Illinois Tool Works Inc., manufacture and market printing systems that include three relevant components: (1) a patented piezoelectric impulse ink jet printhead; (2) a patented ink container, consisting of a bottle and valved cap, which attaches to the printhead; and (3) specially designed, but unpatented, ink. Petitioners sell their systems to original equipment manufacturers (OEMs) who are licensed to incorporate the printheads and containers into printers that are in turn sold to companies for use in printing barcodes on cartons and packaging materials. The OEMs agree that they will purchase their ink exclusively from petitioners, and that neither they nor their customers will refill the patented containers with ink of any kind.

Respondent, Independent Ink, Inc., has developed an ink with the same chemical composition as the ink sold by petitioners. After an infringement action brought by Trident against Independent was dismissed for lack of personal jurisdiction, Independent filed suit against Trident seeking a judgment of noninfringement and invalidity of Trident's patents.[1] In an amended complaint, it alleged that petitioners are engaged in illegal tying and monopolization in violation of §§1 and 2 of the Sherman Act. 15 U. S. C. §§1, 2.

After discovery, the District Court granted petitioners' motion for summary judgment on the Sherman Act claims. *Independent Ink, Inc.* v. *Trident, Inc.*, 210 F. Supp. 2d 1155, 1177 (CD Cal. 2002). It rejected respondent's submission that petitioners "necessarily have market power in the market for the tying product as a matter of law solely by virtue of the patent on their printhead system, thereby rendering [the] tying arrangements *per se* viola-

---

[1] Illinois Tool did not acquire Trident until February 19, 1999, approximately six months after this action commenced.

tions of the antitrust laws." *Id*., at 1159. Finding that respondent had submitted no affirmative evidence defining the relevant market or establishing petitioners' power within it, the court concluded that respondent could not prevail on either antitrust claim. *Id*., at 1167, 1173, 1177. The parties settled their other claims, and respondent appealed.

After a careful review of the "long history of Supreme Court consideration of the legality of tying arrangements," 396 F. 3d 1342, 1346 (2005), the Court of Appeals for the Federal Circuit reversed the District Court's decision as to respondent's §1 claim, *id*., at 1354. Placing special reliance on our decisions in *International Salt Co.* v. *United States*, 332 U. S. 392 (1947), and *Loew's*, 371 U. S. 38, as well as our *Jefferson Parish* dictum, and after taking note of the academic criticism of those cases, it concluded that the "fundamental error" in petitioners' submission was its disregard of "the duty of a court of appeals to follow the precedents of the Supreme Court until the Court itself chooses to expressly overrule them." 396 F. 3d, at 1351. We granted certiorari to undertake a fresh examination of the history of both the judicial and legislative appraisals of tying arrangements. 545 U. S. \_\_ (2005). Our review is informed by extensive scholarly comment and a change in position by the administrative agencies charged with enforcement of the antitrust laws.

## II

American courts first encountered tying arrangements in the course of patent infringement litigation. See, *e.g.*, *Heaton-Peninsular Button-Fastening Co.* v. *Eureka Specialty Co.*, 77 F. 288 (CA6 1896). Such a case came before this Court in *Henry* v. *A. B. Dick Co.,* 224 U. S. 1 (1912), in which, as in the case we decide today, unpatented ink was the product that was "tied" to the use of a patented product through the use of a licensing agreement. Without com-

menting on the tying arrangement, the Court held that use of a competitor's ink in violation of a condition of the agreement—that the rotary mimeograph "'may be used only with the stencil, paper, ink and other supplies made by A. B. Dick Co.'"—constituted infringement of the patent on the machine. *Id.*, at 25–26. Chief Justice White dissented, explaining his disagreement with the Court's approval of a practice that he regarded as an "attempt to increase the scope of the monopoly granted by a patent . . . which tend[s] to increase monopoly and to burden the public in the exercise of their common rights." *Id.*, at 70. Two years later, Congress endorsed Chief Justice White's disapproval of tying arrangements, enacting §3 of the Clayton Act. See 38 Stat. 731 (applying to "patented or unpatented" products); see also *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 517–518 (1917) (explaining that, in light of §3 of the Clayton Act, *A. B. Dick* "must be regarded as overruled"). And in this Court's subsequent cases reviewing the legality of tying arrangements we, too, embraced Chief Justice White's disapproval of those arrangements. See, *e.g.*, *Standard Oil Co. of Cal.* v. *United States*, 337 U. S. 293, 305–306 (1949); *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661, 664–665 (1944).

In the years since *A. B. Dick*, four different rules of law have supported challenges to tying arrangements. They have been condemned as improper extensions of the patent monopoly under the patent misuse doctrine, as unfair methods of competition under §5 of the Federal Trade Commission Act, 15 U. S. C. §45, as contracts tending to create a monopoly under §3 of the Clayton Act, 15 U. S. C. §13a, and as contracts in restraint of trade under §1 of the Sherman Act.[2] In all of those instances, the justification

_____

[2] See, *e.g.*, *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 9 (1984) (Sherman Act); *Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594, 609 (1953) (Federal Trade Commission Act); *Interna-*

for the challenge rested on either an assumption or a showing that the defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied product. As we explained in *Jefferson Parish*, 466 U. S., at 12, "[o]ur cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."

Over the years, however, this Court's strong disapproval of tying arrangements has substantially diminished. Rather than relying on assumptions, in its more recent opinions the Court has required a showing of market power in the tying product. Our early opinions consistently assumed that "[t]ying arrangements serve hardly any purpose beyond the suppression of competition." *Standard Oil Co.*, 337 U. S., at 305–306. In 1962, in *Loew's*, 371 U. S., at 47–48, the Court relied on this assumption despite evidence of significant competition in the market for the tying product. And as recently as 1969, Justice Black, writing for the majority, relied on the assumption as support for the proposition "that, at least when certain prerequisites are met, arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable competitive effect is required." *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 498–499 *(Fortner I).* Explaining the Court's decision to allow the suit to proceed to trial, he stated that "decisions rejecting the need for proof of truly dominant power over the tying product have

———————

*tional Salt Co.* v. *United States,* 332 U. S. 392, 395–396 (1947) (Clayton Act and Sherman Act); *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488, 494 (1942) (patent misuse); *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 516 (1917) (same).

all been based on a recognition that because tying arrange-
ments generally serve no legitimate business purpose that
cannot be achieved in some less restrictive way, the pres-
ence of any appreciable restraint on competition provides a
sufficient reason for invalidating the tie." *Id.*, at 503.

Reflecting a changing view of tying arrangements, four
Justices dissented in *Fortner I*, arguing that the chal-
lenged "tie"—the extension of a $2 million line of credit on
condition that the borrower purchase prefabricated houses
from the defendant—might well have served a legitimate
purpose. *Id.*, at 510 (opinion of White, J.); *id.*, at 520
(opinion of Fortas, J.). In his opinion, Justice White noted
that promotional tie-ins may provide "uniquely advanta-
geous deals" to purchasers. *Id.*, at 519. And Justice For-
tas concluded that the arrangement was best character-
ized as "a sale of a single product with the incidental
provision of financing." *Id.*, at 522.

The dissenters' view that tying arrangements may well
be procompetitive ultimately prevailed; indeed, it did so in
the very same lawsuit. After the Court remanded the suit
in *Fortner I*, a bench trial resulted in judgment for the
plaintiff, and the case eventually made its way back to
this Court. Upon return, we unanimously held that the
plaintiff's failure of proof on the issue of market power was
fatal to its case—the plaintiff had proved "nothing more
than a willingness to provide cheap financing in order to
sell expensive houses." *United States Steel Corp.* v.
*Fortner Enterprises, Inc.*, 429 U. S. 610, 622 (1977)
*(Fortner II)*.

The assumption that "[t]ying arrangements serve hardly
any purpose beyond the suppression of competition,"
rejected in *Fortner II*, has not been endorsed in any opin-
ion since. Instead, it was again rejected just seven years
later in *Jefferson Parish*, where, as in *Fortner II*, we
unanimously reversed a Court of Appeals judgment hold-
ing that an alleged tying arrangement constituted a *per se*

violation of §1 of the Sherman Act. 466 U. S., at 5. Like the product at issue in the *Fortner* cases, the tying product in *Jefferson Parish*—hospital services—was unpatented, and our holding again rested on the conclusion that the plaintiff had failed to prove sufficient power in the tying product market to restrain competition in the market for the tied product—services of anesthesiologists. 466 U. S., at 28–29.

In rejecting the application of a *per se* rule that all tying arrangements constitute antitrust violations, we explained:

> "[W]e have condemned tying arrangements when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market. . . .

> .          .          .          .          .

> "*Per se* condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable. Thus, application of the *per se* rule focuses on the probability of anticompetitive consequences. . . .
> "For example, if the Government has granted the seller a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power. *United States* v. *Loew's Inc.*, 371 U. S., at 45–47. Any effort to enlarge the scope of the patent monopoly by using the market power it confers to restrain competition in the market for a second product will undermine competition on the merits in that second market. Thus, the sale or lease of a patented item on condition that the buyer make all his purchases of a separate tied product from the patentee is unlawful." *Id.*, at 13–16 (footnote omitted).

Notably, nothing in our opinion suggested a rebuttable presumption of market power applicable to tying ar-

rangements involving a patent on the tying good. See *infra*, at 14; cf. 396 F. 3d, at 1352. Instead, it described the rule that a contract to sell a patented product on condition that the purchaser buy unpatented goods exclusively from the patentee is a *per se* violation of §1 of the Sherman Act.

Justice O'Connor wrote separately in *Jefferson Parish*, concurring in the judgment on the ground that the case did not involve a true tying arrangement because, in her view, surgical services and anesthesia were not separate products. 466 U. S., at 43. In her opinion, she questioned not only the propriety of treating any tying arrangement as a *per se* violation of the Sherman Act, *id*., at 35, but also the validity of the presumption that a patent always gives the patentee significant market power, observing that the presumption was actually a product of our patent misuse cases rather than our antitrust jurisprudence, *id*., at 37–38, n. 7. It is that presumption, a vestige of the Court's historical distrust of tying arrangements, that we address squarely today.

### III

Justice O'Connor was, of course, correct in her assertion that the presumption that a patent confers market power arose outside the antitrust context as part of the patent misuse doctrine. That doctrine had its origins in *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502 (1917), which found no support in the patent laws for the proposition that a patentee may "prescribe by notice attached to a patented machine the conditions of its use and the supplies which must be used in the operation of it, under pain of infringement of the patent," *id*., at 509. Although *Motion Picture Patents Co.* simply narrowed the scope of possible patent infringement claims, it formed the basis for the Court's subsequent decisions creating a patent misuse defense to infringement claims when a patentee uses its patent "as the effective means of restraining

competition with its sale of an unpatented article." *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488, 490 (1942); see also, *e.g., Carbice Corp. of America* v. *American Patents Development Corp.*, 283 U. S. 27, 31 (1931).

Without any analysis of actual market conditions, these patent misuse decisions assumed that, by tying the purchase of unpatented goods to the sale of the patented good, the patentee was "restraining competition," *Morton Salt*, 314 U. S., at 490, or "secur[ing] a limited monopoly of an unpatented material," *Mercoid*, 320 U. S., at 664; see also *Carbice*, 283 U. S., at 31–32. In other words, these decisions presumed "[t]he requisite economic power" over the tying product such that the patentee could "extend [its] economic control to unpatented products." *Loew's*, 371 U. S., at 45–46.

The presumption that a patent confers market power migrated from patent law to antitrust law in *International Salt Co.* v. *United States,* 332 U. S. 392 (1947). In that case, we affirmed a District Court decision holding that leases of patented machines requiring the lessees to use the defendant's unpatented salt products violated §1 of the Sherman Act and §3 of the Clayton Act as a matter of law. *Id.*, at 396. Although the Court's opinion does not discuss market power or the patent misuse doctrine, it assumes that "[t]he volume of business affected by these contracts cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious." *Ibid*.

The assumption that tying contracts "ten[d] . . . to accomplishment of monopoly" can be traced to the Government's brief in *International Salt*, which relied heavily on our earlier patent misuse decision in *Morton Salt*. The Government described *Morton Salt* as "present[ing] a factual situation almost identical with the instant case," and it asserted that "although the Court in that case did not find it necessary to decide whether the antitrust laws

were violated, its language, its reasoning, and its citations indicate that the policy underlying the decision was the same as that of the Sherman Act." Brief for United States in *International Salt Co.* v. *United States*, O. T. 1947, No. 46, p. 19 (United States Brief). Building on its assertion that *International Salt* was logically indistinguishable from *Morton Salt*, the Government argued that this Court should place tying arrangements involving patented products in the category of *per se* violations of the Sherman Act. United States Brief 26–33.

Our opinion in *International Salt* clearly shows that we accepted the Government's invitation to import the presumption of market power in a patented product into our antitrust jurisprudence. While we cited *Morton Salt* only for the narrower proposition that the defendant's patents did not confer any right to restrain competition in unpatented salt or afford the defendant any immunity from the antitrust laws, *International Salt*, 332 U. S., at 395–396, given the fact that the defendant was selling its unpatented salt at competitive prices, *id.*, at 396–397, the rule adopted in *International Salt* necessarily accepted the Government's submission that the earlier patent misuse cases supported the broader proposition "that this type of restraint is unlawful on its face under the Sherman Act," United States Brief 12.

Indeed, later in the same Term we cited *International Salt* for the proposition that the license of "a patented device on condition that unpatented materials be employed in conjunction with the patented device" is an example of a restraint that is "illegal *per se.*" *United States* v. *Columbia Steel Co.*, 334 U. S. 495, 522–523, and n. 22 (1948). And in subsequent cases we have repeatedly grounded the presumption of market power over a patented device in *International Salt*. See, *e.g.*, *Loew's*, 371 U. S., at 45–46; *Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594, 608 (1953); *Standard Oil Co.*, 337 U. S., at 304.

## IV

Although the patent misuse doctrine and our antitrust jurisprudence became intertwined in *International Salt*, subsequent events initiated their untwining. This process has ultimately led to today's reexamination of the presumption of *per se* illegality of a tying arrangement involving a patented product, the first case since 1947 in which we have granted review to consider the presumption's continuing validity.

Three years before we decided *International Salt*, this Court had expanded the scope of the patent misuse doctrine to include not only supplies or materials used by a patented device, but also tying arrangements involving a combination patent and "unpatented material or [a] device [that] is itself an integral part of the structure embodying the patent." *Mercoid*, 320 U. S., at 665; see also *Dawson Chemical Co.* v. *Rohm & Haas Co.*, 448 U. S. 176, 188–198 (1980) (describing in detail *Mercoid* and the cases leading up to it). In reaching this conclusion, the Court explained that it could see "no difference in principle" between cases involving elements essential to the inventive character of the patent and elements peripheral to it; both, in the Court's view, were attempts to "expan[d] the patent beyond the legitimate scope of its monopoly." *Mercoid*, 320 U. S., at 665.

Shortly thereafter, Congress codified the patent laws for the first time. See 66 Stat. 792, codified as 35 U. S. C. §1 *et seq.* (2000 ed. and Supp. III). At least partly in response to our *Mercoid* decision, Congress included a provision in its codification that excluded some conduct, such as a tying arrangement involving the sale of a patented product tied to an "essential" or "nonstaple" product that has no use except as part of the patented product or method, from the scope of the patent misuse doctrine. §271(d); see also *Dawson*, 448 U. S., at 214. Thus, at the same time that our antitrust jurisprudence continued to rely on the

assumption that "tying arrangements generally serve no legitimate business purpose," *Fortner I,* 394 U. S., at 503, Congress began chipping away at the assumption in the patent misuse context from whence it came.

It is Congress' most recent narrowing of the patent misuse defense, however, that is directly relevant to this case. Four years after our decision in *Jefferson Parish* repeated the patent–equals–market–power presumption, 466 U. S., at 16, Congress amended the Patent Code to eliminate that presumption in the patent misuse context, 102 Stat. 4674. The relevant provision reads:

> "(d) No patent owner otherwise entitled to relief for in-fringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or il-legal extension of the patent right by reason of his having done one or more of the following: . . . (5) con-ditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a li-cense to rights in another patent or purchase of a separate product, *unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.*" 35 U. S. C. §271(d)(5) (emphasis added).

The italicized clause makes it clear that Congress did not intend the mere existence of a patent to constitute the requisite "market power." Indeed, fairly read, it provides that without proof that Trident had market power in the relevant market, its conduct at issue in this case was nei-ther "misuse" nor an "illegal extension of the patent right."

While the 1988 amendment does not expressly refer to the antitrust laws, it certainly invites a reappraisal of the *per se* rule announced in *International Salt*.[3] A rule deny-

---

[3] While our opinions have made clear that such an invitation is not

ing a patentee the right to enjoin an infringer is significantly less severe than a rule that makes the conduct at issue a federal crime punishable by up to 10 years in prison. See 15 U. S. C. §1. It would be absurd to assume that Congress intended to provide that the use of a patent that merited punishment as a felony would not constitute "misuse." Moreover, given the fact that the patent misuse doctrine provided the basis for the market power presumption, it would be anomalous to preserve the presumption in antitrust after Congress has eliminated its foundation. Cf. 10 P. Areeda, H. Hovenkamp, & E. Elhauge, Antitrust Law ¶1737c (2d ed. 2004) (hereinafter Areeda).

After considering the congressional judgment reflected in the 1988 amendment, we conclude that tying arrangements involving patented products should be evaluated under the standards applied in cases like *Fortner II* and *Jefferson Parish* rather than under the *per se* rule applied in *Morton Salt* and *Loew's*. While some such arrangements are still unlawful, such as those that are the product of a true monopoly or a marketwide conspiracy, see, *e.g.*, *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 145–146 (1948), that conclusion must be supported by proof of power in the relevant market rather than by a mere presumption thereof.[4]

––––––––––

necessary with respect to cases arising under the Sherman Act, see *State Oil Co.* v. *Khan*, 522 U. S. 3, 20 (1997), it is certainly sufficient to warrant reevaluation of our precedent, *id.*, at 21 ("[T]his Court has reconsidered its decisions construing the Sherman Act when the theoretical underpinnings of those decisions are called into serious question").

[4] Our imposition of this requirement accords with the vast majority of academic literature on the subject. See, *e.g.*, 10 Areeda ¶1737a ("[T]here is no economic basis for inferring any amount of market power from the mere fact that the defendant holds a valid patent"); Burchfiel, Patent Misuse and Antitrust Reform: "Blessed be the Tie?" 4 Harv. J. L. & Tech. 1, 57, and n. 340 (noting that the market power presumption has been extensively criticized and citing sources); 1 H. Hovenkamp, M.

## V

Rather than arguing that we should retain the rule of *per se* illegality, respondent contends that we should endorse a rebuttable presumption that patentees possess market power when they condition the purchase of the patented product on an agreement to buy unpatented goods exclusively from the patentee. Cf. *supra*, at 7–8. Respondent recognizes that a large number of valid patents have little, if any, commercial significance, but submits that those that are used to impose tying arrangements on unwilling purchasers likely do exert significant market power. Hence, in respondent's view, the presumption would have no impact on patents of only slight value and would be justified, subject to being rebutted by evidence offered by the patentee, in cases in which the patent has sufficient value to enable the patentee to insist on acceptance of the tie.

Respondent also offers a narrower alternative, suggesting that we differentiate between tying arrangements involving the simultaneous purchase of two products that are arguably two components of a single product—such as the provision of surgical services and anesthesiology in the same operation, *Jefferson Parish*, 466 U. S., at 43 (O'Connor, J., concurring in judgment), or the licensing of one copyrighted film on condition that the licensee take a package of several films in the same transaction, *Loew's*, 371 U. S. 38—and a tying arrangement involving the purchase of unpatented goods over a period of time, a so-called "requirements tie." See also Brief for Barry Nalebuff et al. as *Amici Curiae.* According to respondent, we should recognize a presumption of market power when

---

Janis, & M. Lemley, IP and Antitrust §4.2a (2005 Supp.) ("[C]overage of one's prodcut with an intellectual property right does not confer a monopoly"); W. Landes & R. Posner, The Economic Structure of Intellectual Property Law 374 (2003) (hereinafter Landes & Posner).

faced with the latter type of arrangements because they provide a means for charging large volume purchasers a higher royalty for use of the patent than small purchasers must pay, a form of discrimination that "is strong evidence of market power." Brief for Respondent 27; see generally *Jefferson Parish*, 466 U. S., at 15, n. 23 (discussing price discrimination of this sort and citing sources).

The opinion that imported the "patent equals market power" presumption into our antitrust jurisprudence, however, provides no support for respondent's proposed alternative. In *International Salt*, it was the existence of the patent on the tying product, rather than the use of a requirements tie, that led the Court to presume market power. 332 U. S., at 395 ("The appellant's patents confer a limited monopoly of the invention they reward"). Moreover, the requirements tie in that case did not involve any price discrimination between large volume and small volume purchasers or evidence of noncompetitive pricing. Instead, the leases at issue provided that if any competitor offered salt, the tied product, at a lower price, "the lessee should be free to buy in the open market, unless appellant would furnish the salt at an equal price." *Id.,* at 396.

As we have already noted, the vast majority of academic literature recognizes that a patent does not necessarily confer market power. See n. 4, *supra.* Similarly, while price discrimination may provide evidence of market power, particularly if buttressed by evidence that the patentee has charged an above-market price for the tied package, see, *e.g.*, 10 Areeda ¶1769c, it is generally recognized that it also occurs in fully competitive markets, see, *e.g.*, Baumol & Swanson, The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria of Market Power, 70 Antitrust L. J. 661, 666 (2003); 9 Areeda ¶1711; Landes & Posner 374–375. We are not persuaded that the combination of these two factors should give rise to a presumption of market power

when neither is sufficient to do so standing alone. Rather, the lesson to be learned from *International Salt* and the academic commentary is the same: Many tying arrangements, even those involving patents and requirements ties, are fully consistent with a free, competitive market. For this reason, we reject both respondent's proposed rebuttable presumption and their narrower alternative.

It is no doubt the virtual consensus among economists that has persuaded the enforcement agencies to reject the position that the Government took when it supported the *per se* rule that the Court adopted in the 1940's. See *supra*, at 8. In antitrust guidelines issued jointly by the Department of Justice and the Federal Trade Commission in 1995, the enforcement agencies stated that in the exercise of their prosecutorial discretion they "will not presume that a patent, copyright, or trade secret necessarily confers market power upon its owner." U. S. Dept. of Justice and FTC, Antitrust Guidelines for the Licensing of Intellectual Property §2.2 (Apr. 6, 1995), available at http://www.usdoj.gov/atr/public/guidelines/0558.pdf (as visited Feb. 24, 2006, and available in Clerk of Court's case file). While that choice is not binding on the Court, it would be unusual for the Judiciary to replace the normal rule of lenity that is applied in criminal cases with a rule of severity for a special category of antitrust cases.

Congress, the antitrust enforcement agencies, and most economists have all reached the conclusion that a patent does not necessarily confer market power upon the patentee. Today, we reach the same conclusion, and therefore hold that, in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product.

## VI

In this case, respondent reasonably relied on our prior opinions in moving for summary judgment without offer-

ing evidence defining the relevant market or proving that petitioners possess power within it.  When the case returns to the District Court, respondent should therefore be given a fair opportunity to develop and introduce evidence on that issue, as well as any other issues that are relevant to its remaining §1 claims.  Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.