SUBSOLUTIONS, INC., and Deco
Solutions Group, Inc.

v.

DOCTOR'S ASSOCIATES, INC.
and Computer Register
Associates, Inc.

No. 3:98 CV 0470(AHN).

United States District Court,
D. Connecticut.

March 30, 2006.

Constantine G. Antipas, The Antipas
Law Firm, Mystic, CT, Raul Davila–Car-
los, Davila & Dilzer, New Britain, CT, for
Deco Solutions Group Inc, Subsolutions
Inc, Plaintiffs.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

Plaintiffs SubSolutions, Inc. ("SubSolu-
tions") and Deco Solutions Group, Inc.
("Deco") bring this action against defen-
dants Doctor's Associates, Inc. ("DAI")
and Computer Register Associates, Inc.
("CRA") for violations of the Sherman An-
titrust Act,[1] 15 U.S.C. § 1, and the Clayton
Antitrust Act,[2] 15 U.S.C. § 14; tortious

---

1. The Sherman Act prohibits "[e]very con-
tract, combination in the form of trust or
otherwise, or conspiracy, in restraint of trade
or commerce among the several States...."
15 U.S.C. § 1.

2. The Clayton Act provides in relevant part:
It shall be unlawful for any person engaged
in commerce, in the course of such com-
merce, to lease or make a sale or contract
for sale of goods, [etc.,] ... on the condi-

interference with a business expectancy; and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110b. SubSolutions and Deco (collectively "the Plaintiffs") allege that DAI and CRA (collectively "the Defendants") engaged in an unlawful tying arrangement whereby purchasers of Subway franchises were required to also purchase certain computerized cash-register, or Point–of–Sale ("POS") systems from an exclusive vendor that DAI owned. DAI contends that its selection of an exclusive vendor for POS-systems does not run afoul of federal antitrust laws, even if DAI owned that exclusive vendor.

Now pending before the court are the Plaintiffs' and DAI's cross motions for summary judgment.[3] For the following reasons, the court concludes that the Plaintiffs have failed to demonstrate the essential elements of a tying claim and thus finds that DAI is entitled to summary judgment.

### Facts and Procedural History

The parties' D. Conn. R. Civ. P. 56(a) statements reveal that the parties are largely in accord about the central factual issues in this case, i.e., the characteristics of the market for POS systems. The only material facts that are arguably in dispute involve the prices for POS-systems before and after the bidding process, but that factual dispute does not prohibit entry of summary judgment because the Plaintiffs cannot establish two other essential elements of their claim, and thus the court does not need to reach the question of whether the exclusive-vendor contract ulti-

mately resulted in supracompetitive prices for POS-systems.

### A. Undisputed Facts

DAI is a Florida corporation with its principal place of business in Milford, Connecticut, that sells and services "Subway" sandwich-shop franchises. DAI requires every Subway franchisee to sign a standard, 20–year franchise agreement. This agreement covers virtually every aspect of running a Subway sandwich shop, from paperwork controls to the proper "look and feel" of the shop. Under the franchise agreement, DAI may also require its franchisees to purchase particular products and equipment from approved vendors. The franchise agreement gives DAI the power to unilaterally amend its basic requirements to meet "new competitive challenges and technological advances."

In 1997, DAI determined that the Subway franchise system would benefit from the universal use of PC-based POS-systems—computer hardware and software systems that replace traditional cash registers—that were specifically designed for Subway franchisees (and thus could not be used interchangeably in other retail operations). At first, DAI maintained a short list of approved POS-vendors, including the Plaintiffs, but in 1997 DAI initiated a bidding process to select an exclusive vendor to sell POS-systems to franchisees. In December 1997, DAI formed CRA as a subsidiary company to develop POS-software that would eventually become the sole approved POS-software for its franchises. Eight existing POS-vendors, including the Plaintiffs, but not CRA, participated in the bidding pro-

tion, agreement or understanding that the ... purchaser thereof shall not use or deal in the goods ... of a competitor ... where the effect of ... such condition ... may be to substantially lessen competition or tend

to create a monopoly in any line of commerce.
15 U.S.C. § 14.

**3.** Defendant CRA does not appear to join in DAI's motion for summary judgment.

cess for the exclusive-vendor contract. During the bidding process, DAI founder and president, Frederick DeLuca ("DeLuca"), conducted most of the price negotiations for the exclusive-vendor agreement.

On February 24, 1998, DAI designated Retail Business Systems, Inc. ("RBS") as the exclusive POS-vendor [4] and required all franchisees to install a RBS "Sub Shop/2000" POS-system by January 1, 2001. Franchises that had already purchased other POS systems as of February 1998 were exempted from this requirement. After RBS was selected as the exclusive POS-vendor, DAI's newly-formed subsidiary, CRA, acquired non-exclusive perpetual rights to RBS's Sub Shop/2000 system. On June 13, 2000, CRA dissolved and assigned all of its rights, including the Sub Shop/2000 license, to DAI.

In July 2000, DAI revised its exclusive-vendor policy and allowed Subway franchisees to purchase POS-systems from whatever vendors they chose, so long as the systems met all DAI specifications and properly recorded and transmitted all required data to DAI headquarters. By late 2004, approximately 15,800 Subway franchises used the Sub Shop/2000 system; 1,120 used a more recently-developed system from another vendor, POSitouch; 485 used SubSolutions' system; and 585 used other Subway-tailored systems. About 1,000 franchises still do not have a POS-system because by late 2004, DAI had waived the requirement that those individual franchisees use a POS-system.

### B. *Disputed Facts*

The Plaintiffs and DAI agree that after RBS was selected as the exclusive vendor for the POS-system, the final price for an integrated-Sub Shop/2000 system was $4,295. However, the parties dispute whether DeLuca's negotiations resulted in a lower price that the franchisees would have to pay for the POS-system. DAI claims that a comparable SubSolutions system cost between $5,495 and $5,995 at the start of the bidding process, and that Sub Shop/2000's final price of $4,295 resulted in a substantial price reduction. In contrast, the Plaintiffs contend that the actual cost that franchisees would have to pay for the Sub Shop/2000 system was higher than the cost of other POS systems because the $4,295 purchase price for Sub Shop/2000 did not include post-purchase fees that franchisees were required to pay, whereas those fees were included in the pre-bidding price of the SubSolutions system. DAI does not dispute that these post-purchase fees were imposed annually after the Sub Shop/2000 system was named as the exclusive POS-system, but they challenge the Plaintiffs' calculation of the total cost of a Sub Shop/2000 POS-system.

### C. *Procedural History*

In March 1998, shortly after DAI announced that RBS would be the exclusive POS-vendor, SubSolutions and Deco filed suit against DAI and CRA. The Defendants moved to dismiss the suit for failure to state a claim, but the court denied the motion, concluding that, *inter alia*, the Plaintiffs might be able to prove the essential element of market power in a tying claim through the *Kodak* lock-in theory. *See SubSolutions, Inc. v. Doctor's Assocs., Inc. ("SubSolutions I")*, 62 F.Supp.2d 616 (D.Conn.1999). After this decision, the Plaintiffs moved for the court to reconsider its earlier denial of its preliminary injunction request. On reconsideration, the court again denied the request, concluding that the Plaintiffs' claims were unlikely to

---

4. The Plaintiffs originally named RBS as a defendant in the present action, but the court dismissed their claims against it on May 21, 1998.

succeed on the merits. *See SubSolutions, Inc., v. Doctor's Assocs., Inc.* ("*SubSolutions II*"), No. 3:98cv470 (AHN), 2001 U.S. Dist. Lexis 24393, at *6–7 (D.Conn. Apr. 6, 2001). In that ruling, the court explained what the Plaintiffs must show to establish the elements of separate products and market power. *See id.* at *25–26; *see also Subsolutions I,* 62 F.Supp.2d at 625–26 (adopting *Little Caesar* test for showing market power under *Kodak* in the franchising context). The application of these tests for separate products and market power forms the central issue of the instant motions.

## STANDARD

The court will grant summary judgment on a claim when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a) & (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment on a claim shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain summary judgment. *See Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. 2548. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly sup-

ported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis omitted). Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548. In the absence of such evidence going to issues on which the nonmoving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998).

## DISCUSSION

The Plaintiffs' central claim is that DAI engaged in an illegal tying scheme between February 1998, when DAI selected RBS as its exclusive vendor for the POS-system, and July 2000, when DAI abandoned the exclusive-vendor policy. Based on the fact that CRA, DAI's controlled entity, acquired the license rights to RBS's POS-system technology after RBS became the sole POS-vendor, the Plaintiffs claim that DAI's exclusive-vendor POS-policy effectively required franchisees to purchase POS-systems exclusively from DAI itself.

They maintain that DAI's requirement that all Subway franchisees purchase a CRA–DAI POS-system created an illegal tying arrangement between the tying product (the Subway franchise) and the tied product (the POS-system) and that this tying policy was anticompetitive under antitrust law and caused the market to suffer an antitrust injury.

The Plaintiffs' state-law CUTPA and tortious interference claims also hinge on the legality of this arrangement under antitrust law. However, based on the undisputed facts of the case, the Plaintiffs have failed to establish at least two essential elements of an illegal tying arrangement— (1) the existence of two separate products and (2) market power in the tying product—and thus cannot prevail on their complaint.[5]

### I. *Tying Arrangements*

The Supreme Court has long condemned certain tying arrangements in which a defendant restrains competition by using its market power in one product to force consumers to purchase another product. *See Ill. Tool Works, Inc. v. Indep. Ink, Inc.,* — U.S. —, —, 126 S.Ct. 1281, 1286, 164 L.Ed.2d 26 (2006). The Court has explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12,

104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). Two types of economic injury characteristically arise from such an arrangement: first, foreclosure to the vendee of alternate sources of supply for the second, or tied, product; and second, foreclosure of possible markets to other competing suppliers of the tied product. *See Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

However, the *Illinois Tool* Court observed that "[o]ver the years ... this Court's strong disapproval of tying arrangements has substantially diminished," *Ill. Tool,* 126 S.Ct. at 1286, and indeed has rejected its earlier rule that all tying arrangements are inherently anticompetitive. *See id.* at 1287. Therefore, "in its more recent opinions the Court has required a showing of market power in the tying product." *Id.* at 1286. As the Court has emphasized, a plaintiff who alleges impermissible tying must demonstrate the existence of two separate products, as determined by the character of the demand for each product. *See Jefferson Parish,* 466 U.S. at 19, 104 S.Ct. 1551. These two characteristics of an illegal tying arrangement—separate products and market power in the tying product—form the central legal issues on which the instant motions for summary judgment turn.

Consistent with Supreme Court precedent, the Second Circuit has established a five-prong test to demonstrate that a tying arrangement violates the Sherman Act or Clayton Act. Under that test the Plaintiffs must show (1) a tying and a tied product; (2) evidence of actual coercion by the seller

---

5. The Plaintiffs have also alleged that DAI and RBS engaged in a conspiracy in violation of the Sherman Act by requiring DAI's franchisees to purchase POS systems from RBS. To support such a claim, the Plaintiffs must demonstrate a combination or some form of concerted action between at least two legally distinct economic entities that constitutes an unreasonable restraint on interstate trade or commerce. *See Subsolutions I,* 62 F.Supp.2d at 627 (citing *Daniel, M.D. v. Am. Bd. of Emergency Med.,* 988 F.Supp. 112, 123 (W.D.N.Y.1997)). Because this court concludes that DAI's exclusive-vendor policy was not an unreasonable restraint on trade, this antitrust conspiracy claim must also fail.

that forced the buyer to accept the tied product; (3) sufficient economic power in the tying-product market to coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the tied market; and (5) the involvement of a "not insubstantial" amount of interstate commerce in the tied market. *See Hack v. President of Yale College,* 237 F.3d 81, 86 (2d Cir.2000); *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996)("elements are common to claims asserted under either the Sherman or Clayton Acts"). The Plaintiffs insist that they have proven each of these five elements. DAI contends that the Plaintiffs cannot show either the existence of two separate products, DAI's market power in the tying product, or the anticompetitive effects of the arrangement. As previously noted, the court will not reach the last contention because it agrees with DAI that the Plaintiffs have not demonstrated that a Subway franchise and a Subway POS-system are separate products and that DAI had sufficient market power in the tying product under the *Kodak* lock-in theory.

### A. "Separate Products" Prong

■ In this case, the first element in dispute is whether the Subway franchise and the POS-system constitute two distinct products such that the purchase of one product is tied to the other. The Supreme Court has explained the rationale for this element of a tying claim:

> [T]here must be a coherent economic basis for treating the tying and tied products as distinct. All but the simplest products can be broken down into two or more components that are "tied together" in the final sale. Unless it is to be illegal to sell cars with engines or cameras with lenses, this analysis must be guided by some limiting principle. For products to be treated as distinct, the tied product must, at a minimum, be

one that some consumers might wish to purchase separately *without also purchasing the tying product.*

*Jefferson Parish,* 466 U.S. at 39, 104 S.Ct. 1551 (O'Connor, J., concurring). The majority in *Jefferson Parish* established a test for determining when there are two separate products for purposes of a tying analysis. Applied to the facts of this case, the *Jefferson Parish* test requires the Plaintiffs to show that there is a sufficient demand for the purchase of POS-systems "separate from" Subway franchises to identify a distinct product market in which it is efficient to offer POS-systems separately from Subway franchises. *See id.* at 21–22, 104 S.Ct. 1551.

Previously in this case, the court noted that the Plaintiffs were unlikely to show the existence of two distinct products because the Plaintiffs had conceded that there was "absolutely no demand to purchase or produce the Subway POS system except in conjunction with a Subway franchise." *SubSolutions II,* 2001 U.S. Dist. LEXIS 24393, at *26. There is nothing new or additional in the record now before the court to alter this conclusion. The parties still do not dispute that (1) a small number of vendors sold POS-systems before 1998; (2) DAI recognized one exclusive vendor between 1998 and 2000; and (3) only a Subway franchisee would want to purchase a Subway POS-system. Nonetheless, the Plaintiffs now contend that the court's application of the *Jefferson Parish* separate products test in *SubSolutions II* was incorrect.

Specifically, they argue that under *Jefferson Parish,* they need show only that vendors other than CRA wished to sell POS-systems to Subway franchisees and that the focus should be on the potential seller's perception of the market, not the consumer's perception. They rely on *Lit-*

*tle Caesar Enters., Inc. v. Smith*, 34 F.Supp.2d 459 (E.D.Mich.1998), which considered whether the logoed-paper products that the franchisor required its franchisees to purchase from an affiliated entity constituted products separate from the franchise itself, and ruled that, because at one time many distributors unrelated to the franchisor provided the logoed items to franchisees, there was an independent demand for these products. *See id.* at 469–70. The Plaintiffs argue that the facts in *Little Caesar* parallel those at issue here because a number of POS-makers sold POS-systems to Subway franchisees before DAI selected CRA as the exclusive POS-system vendor.

This court, however, previously distinguished the facts of *Little Caesar* from the present case on three grounds, *see SubSolutions II*, 2001 U.S. Dist. Lexis 24393, at *23–24, and the Plaintiffs have submitted no additional facts that would call those distinctions into question, as previously noted. First, although DAI permitted other POS-vendors to sell POS-systems to franchisees before February 1998, it always maintained a short list of approved vendors and established computer-formatting requirements. *See id.* at *23. Second, the court observed that a POS-system is far more integral to the functioning of a sandwich shop than the napkins and condiments at issue in *Little Caesar*. *See id.* at *23–24. Third, the POS-system at issue in this case is highly unique when compared with the entire "market basket" of goods that a Subway franchisee must purchase. In contrast, *Little Caesar* noted that the logoed products at issue in that case constituted only ten percent of the goods that pizza franchisees were required to purchase under the franchise agreement. *See id.* at *24.

Unlike *Little Caesar*, this case does not involve restraints on largely fungible supplies, but rather a product that plays a central role in the efficient functioning of the franchise. Thus the approach in *Casey v. Diet Ctr., Inc.*, 590 F.Supp. 1561 (N.D.Cal.1984), is more suited than *Little Caesar* to this case. In *Casey*, the franchisor of weight-loss centers required its franchisees to purchase certain specially-designed diet pills directly from it. The *Casey* court, applying the *Jefferson Parish* test, found that the franchise and the diet pills were not separate products for purposes of tying, as there would be no market for the pills apart from the specific weight-loss regimen prescribed by the diet center. *See id.* at 1564.

Indeed, the analysis in *Casey* is more faithful to the teaching of *Jefferson Parish*. In *Jefferson Parish*, a hospital entered into an agreement with a group of anesthesiologists ("the Group") pursuant to which only the Group's anesthesiologists were permitted to practice at the hospital. *See Jefferson Parish*, 466 U.S. at 6, 104 S.Ct. 1551. An anesthesiologist who did not practice with the Group challenged this exclusive contract as an impermissible tying arrangement because it forced users of the hospital's operating rooms (the tying product) to use the Group's anesthesiological services (the tied product). *See id.* at 5, 8, 104 S.Ct. 1551.

The Court stated that "in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services." *Id.* at 21–22, 104 S.Ct. 1551. The Court focused on the preferences of consumers, as opposed to potential vendors, noting that "patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia...." *Id.* at 22, 104 S.Ct. 1551.

Although the Plaintiffs in this case insist that the number of vendors who wish to sell POS-systems to Subway franchisees is dispositive of this issue, the *Jefferson Parish* Court did not even consider the number of anesthesiologists who were not in the Group who may have wanted to practice at the hospital. Indeed, it considered irrelevant the fact that those other anesthesiologists wanted to enter the market. Thus, based on the Court's analysis in *Jefferson Parish* and contrary to the Plaintiffs' argument, the fact that a number of other vendors wanted to sell POS-systems to Subway franchisees before 1998 is irrelevant to the determination of whether a Subway franchise and a POS-system are separate products.

Rather, as *Jefferson Parish* teaches, the proper inquiry is whether there is a demand for POS-systems that is independent of the demand for Subway franchises. *See SubSolutions II*, 2001 U.S. Dist. LEXIS 24393, at *17. Because the Plaintiffs have conceded that they are unable to demonstrate that anyone other than a Subway franchisee would want to purchase a Subway-tailored POS-system, the Plaintiffs cannot satisfy an essential element of their tying claims—that a Subway franchise and a POS-system are two distinct products.

### B. *Market Power*

■ Nonetheless, if the Plaintiffs could demonstrate that a Subway franchise and a Subway POS-system are two distinct products for antitrust purposes, their claim would still fail because they have not demonstrated another essential element of a tying claim—DAI's market power in the tying product, i.e., Subway franchises. While the Plaintiffs attempt to show market power through the *Kodak* lock-in theory, their efforts are unavailing even under a lock-in theory because they do not show that DAI engaged in exploitation that a reasonable Subway franchisee could not have expected. *See Subsolutions I*, 62 F.Supp.2d at 626.[6]

In *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the Supreme Court introduced a "lock-in" theory as a means by which certain plaintiffs could show the required market power in the tying product. In *Kodak*, the defendant had implemented a policy whereby it only sold replacement parts for its copiers to consumers who purchased a service contract from it. *See id.* at 458, 112 S.Ct. 2072. Those who had purchased Kodak copiers for many thousands of dollars before the policy went into effect were "locked in" and thus were forced to use Kodak's maintenance services because the cost of switching to another copying system at that point would exceed any savings that might be realized from access to more inexpensive replacement parts. *See id.* at 473, 112 S.Ct. 2072. Therefore, under *Ko-*

---

**6.** As previously noted, one of the elements of the Second Circuit's five-prong test for an illegal tying arrangement is that the defendant exercised "sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product." *Hack*, 237 F.3d at 86. Previously, in considering the Defendants' motion to dismiss, this court concluded that the Plaintiffs had not identified a relevant market for the tying product, that is, a market in which DAI could wield disproportionate power because of the low cross-elasticity of demand for other franchising opportunities. *See Subsolutions I*, 62 F.Supp.2d at 624–25. In effect, the court held that the Plaintiffs had failed to allege facts showing that the demand for a Subway franchise was distinct from the demand for some other franchising opportunity. Nonetheless, this court found that the Plaintiffs could satisfy the "sufficient economic power" prong through an alternative test: the "lock-in" theory articulated in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

*dak,* even if a defendant does not hold a dominant position in the market for the tying product, he may nonetheless have sufficient economic power to coerce such a locked-in consumer to purchase the tied product.

Although DAI contends that the *Kodak* lock-in theory cannot be applied in the franchising context, this court has already determined otherwise. *See Subsolutions I,* 62 F.Supp.2d at 625. In that prior ruling the court adopted the *Little Caesar* test and said that the Plaintiffs could demonstrate DAI's market power under the *Kodak* lock-in theory by showing that (1) DAI engaged in exploitation that reasonable franchisees could not reasonably anticipate, and (2) the franchisees could not reasonably protect themselves in the marketplace by obtaining contract guarantees or warranties from DAI or its rivals. *See id.* at 626 (citing *Little Caesar,* 34 F.Supp.2d at 490). Now, on the basis of the undisputed facts in the present record, the Plaintiffs have not shown that DAI's selection of an exclusive vendor for POS-systems was unforeseeable. Thus, the court can conclude that the Plaintiffs have not established that DAI had the required market power without having to consider whether its selection of an exclusive vendor for POS-systems constituted exploitation.

In an attempt to show foreseeability, the Plaintiffs argue that before 1998, Subway franchisees could not reasonably have anticipated that DAI would modify its policy to require all franchisees to purchase a POS-system from an exclusive vendor. The Plaintiffs observe that in 1996, only about 10 percent of Subway franchises had computerized their operations, and at that time DAI had not required the franchisees to upgrade to such a system, and based on affidavits of 11 franchisees, they assert that franchisees could not have reasonably foreseen DAI's implementation of a mandatory POS policy. But this evidence simply does not support their argument. The fact that 10 percent of Subway franchisees already had implemented POS-systems by 1996 indicates that such systems were already available for use by franchisees. The benefits of a POS-system over a traditional cash register in data collection and transmission are obvious, and any reasonable franchisee could have anticipated that such systems would become a dominant technology for his sandwich shop. Indeed, as early as 1996, DAI's Uniform Franchise Offering Circular stated that DAI was considering requiring its franchisees to purchase an electronic cash register or computer system. Further it is an undisputed fact that in franchise agreements DAI reserved the right to change its product requirements and approved vendors and specified that it could in its discretion require its franchisees to purchase products from particular vendors. Thus, any prospective franchisee knew that DAI might require it to purchase some essential item from an exclusive vendor. *See Queen City Pizza v. Domino's Pizza,* 124 F.3d 430, 440–41 (3d Cir.1997) (observing that courts and legal commentators have long recognized that franchise tying contracts prevent "free riding—offering products of sub-standard quality insufficient to maintain the reputational value of the franchise product while benefiting from the quality control efforts of other actors in the franchise system"). The Plaintiffs simply have failed to demonstrate that a prospective Subway franchisee prior to 1998 could not reasonably have anticipated that DAI might require him to purchase such an integral item as a POS-system from one authorized vendor. In the absence of this necessary showing, the Plaintiffs have not shown that Subway franchisees were "locked in" as *Kodak* requires. Thus, not only are the Plaintiffs unable to show the

existence of two distinct products, they also are unable to show market power, and summary judgment on their federal antitrust claims is warranted.

## II. *State–Law Claims*

The Plaintiffs remaining claims are based entirely on their underlying tying claim. Specifically, they allege that DAI interfered with their business expectancy[7] and violated CUTPA[8] by wrongfully terminating the Plaintiffs' status as approved vendors, thereby causing Subway franchisees to terminate existing agreements for the purchase and servicing of the Plaintiffs' products. The Plaintiffs, however, have produced no evidence beyond the alleged tying arrangement itself that would demonstrate that DAI's conduct was either tortious or unfair. Because these state-law claims are based exclusively on their unsuccessful claims that the DAI violated federal antitrust laws, summary judgment on these claims is also warranted.

## CONCLUSION

For the foregoing reasons, DAI's motion for summary judgment [doc #170] is GRANTED. The Plaintiffs' motion for summary judgment [doc #172] is DENIED.

---

7. To prevail under Connecticut law on a claim for tortious interference with a business expectancy, the Plaintiffs must prove the existence of a business relationship, DAI's knowledge of the relationship, intentional interference with the relationship, and consequential loss. *Subsolutions I*, 62 F.Supp.2d at 628 (citing *Chem–Tek, Inc. v. Gen. Motors Corp.*, 816 F.Supp. 123, 130 (D.Conn.1993)).

8. A practice is unfair under CUTPA if (1) without necessarily having been previously considered unlawful, it offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it

is within at least the penumbra of some common law, statutory, or other established concept of unfairness; or (2) it is immoral, unethical, oppressive, or unscrupulous; or (3) it causes substantial injury to consumers, competitors, or other businesspersons. *See Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 155, 881 A.2d 937 (2005). All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *See id.*