**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROB BRANTLEY, DARREN COOKE,
WILLIAM and BEVERLEY COSTLEY,
PETER G. HARRIS, CHRISTIANA
HILLS, MICHAEL B. KOVAC,
MICHELLE NAVARRETTE, JOY
PSACHIE and JOSEPH VRANICH,
individually and on behalf of all
others similarly situated,
                   *Plaintiffs-Appellants,*

                 v.

NBC UNIVERSAL, INC., VIACOM
INC., THE WALT DISNEY COMPANY,
FOX ENTERTAINMENT GROUP, INC.,
TIME WARNER INC., TIME WARNER
CABLE INC., COMCAST CORPORATION,
COMCAST CABLE COMMUNICATIONS,
LLC, COXCOM, INC., THE DIRECTV
GROUP, INC., ECHOSTAR SATELLITE
L.L.C., and CABLEVISION SYSTEMS
CORPORATION,
                   *Defendants-Appellees,*

No. 09-56785

D.C. No.
CV 07-6101 CAS
(VBKx)

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
March 7, 2011—Pasadena, California

Filed March 30, 2012

3481

Before: Barry G. Silverman, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

**COUNSEL**

Maxwell M. Blecher, Esq., Blecher & Collins, PC, Los Angeles, California, for plaintiffs-appellants Rob Brantley, et al.

Glenn D. Pomerantz, Esq., Munger Tolles & Olson LLP, Los Angeles, California, and Arthur J. Burke, Esq., Davis Polk & Wardwell LLP, Menlo Park, California, for defendants-appellees NBC Universal, Inc., et al.

**OPINION**

IKUTA, Circuit Judge:

Plaintiffs, a putative class of retail cable and satellite television subscribers, appeal the dismissal of the third version of their complaint against television programmers (Programmers)[1] and distributors (Distributors).[2] The complaint alleged that Programmers' practice of selling multi-channel cable packages violates Section 1 of the Sherman Act, 15 U.S.C. § 1. In essence, plaintiffs seek to compel programmers and distributors of television programming to sell each cable channel separately, thereby permitting plaintiffs to purchase only those channels that they wish to purchase, rather than paying for multi-channel packages, as occurs under current market practice. Plaintiffs appeal the dismissal with prejudice of their complaint for failure to state a claim. We affirm.

I

The television programming industry can be divided into upstream and downstream markets. In the upstream market, programmers such as NBC Universal and Fox Entertainment Group own television programs (such as "Law and Order") and television channels (such as NBC's Bravo and MSNBC, and Fox Entertainment Group's Fox News Channel and FX) and sell them wholesale to distributors. In the downstream retail market, distributors such as Time Warner and Echostar sell the programming channels to consumers.[3]

---

[1]Programmer Defendants include NBC Universal, Inc., Viacom, Inc., The Walt Disney Company, Fox Entertainment Group, Inc., and Turner Broadcasting System, Inc.

[2]Distributor Defendants include Time Warner Cable Inc., Comcast Corporation, Comcast Cable Communications, LLC, CoxCom, Inc., The DIRECTV Group, Inc., Echostar Satellite L.L.C., and Cablevision Systems Corporation.

[3]Plaintiffs acknowledge three categories of distributors, namely, cable providers, satellite providers, and telephone companies. Plaintiffs have filed suit only against the cable and satellite providers.

According to plaintiffs' third amended complaint, Programmers have two categories of programming channels: "must-have" channels with high demand and a large number of viewers, and a group of less desirable, low-demand channels with low viewership. Plaintiffs allege that "[e]ach programmer defendant, because of its full or partial ownership of a broadcast channel and its ownership or control of multiple important cable channels, has a high degree of market power vis-a-vis all distributors," and that Programmers exploit this market power by requiring distributors, "as a condition to purchasing each programmer's broadcast channel and its 'must have' cable channels," to "also acquire and resell to consumers all the rest of the cable channels owned or controlled by each programmer" and "agree they will not offer unbundled [i.e., individual] cable channels to consumers." "As a consequence," plaintiffs contend, "distributors can offer consumers only prepackaged tiers of cable channels which consist of each programmer's entire offering of channels." Plaintiffs allege that these business practices impair competition among Distributors for consumer business, and therefore the Programmers and Distributors are in violation of Section 1 of the Sherman Act. Plaintiffs seek monetary damages under 15 U.S.C. § 15.[4] Plaintiffs also seek an injunction to compel Programmers to make channels available on an individual basis.

---

[4]Section 15 states in pertinent part:

> Except as provided in subsection (b) of this section [relating to damages payable to foreign states and their instrumentalities], any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.

15 U.S.C. § 15(a).

The district court dismissed plaintiffs' first amended complaint without prejudice on the ground that plaintiffs failed to show that their alleged injuries were caused by an injury to competition. In their second amended complaint, plaintiffs alleged that Programmers' practice of selling packaged cable channels foreclosed independent programmers from entering and competing in the upstream market for programming channels. The district court subsequently denied defendants' motion to dismiss, holding that plaintiffs had adequately pleaded injury to competition.

After preliminary discovery efforts on the question whether the Programmers' practices had excluded independent programmers from the upstream market, the plaintiffs decided to abandon this approach.[5] Pursuant to a stipulation among the parties, plaintiffs filed their third amended complaint, which deleted all allegations that the Programmers and Distributors' contractual practices foreclosed independent programmers from participating in the upstream market, along with a motion requesting the court to rule that plaintiffs did not have to allege foreclosure in the upstream market in order to defeat a motion to dismiss. The parties also agreed that Programmers and Distributors could file a motion to dismiss, and that if Programmers and Distributors prevailed, this third complaint would be dismissed with prejudice. The district court entered an order on October 15, 2009 granting Programmers and Distributors' motion to dismiss the third amended complaint with prejudice because plaintiffs failed to allege any cognizable injury to competition. The district court also denied plaintiffs' motion to rule on the question whether allegations of foreclosed competition are required to state a Section 1 claim. Plaintiffs timely appeal.

---

[5]Programmers and Distributors claim that plaintiffs decided to discontinue discovery after preliminary review showed there was no evidence to support their claim that the packaging of channels foreclosed competition in the upstream market.

## II

**[1]** Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. While Section 1 could be interpreted to proscribe nearly all contracts, the Supreme Court has never "taken a literal approach to [its] language," *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *see also Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918). Rather, the Court has repeatedly observed that Section 1 "outlaw[s] only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

We generally evaluate whether a practice unreasonably restrains trade in violation of Section 1 under the "rule of reason."[6] *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). "In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* at 886. The parties do not dispute that the rule of reason applies in this case,[7] and the pleading requirements for a rule of reason case therefore apply.

---

[6]The Supreme Court has identified a small number of restraints of trade "that would always or almost always tend to restrict competition and decrease output," *see Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (internal quotation marks omitted) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90 (1985)), such as horizontal agreements among competitors to fix prices, *see Texaco*, 547 U.S. at 5, or to divide markets, *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam). The Court deems these restraints to be per se unlawful. *See Bus. Elecs.*, 485 U.S. at 723. These practices are not at issue here.

[7]In the case of "tying" claims, a per se rule is applied in some circumstances. A tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff proves "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses

We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046 (9th Cir. 2008). In order to state a Section 1 claim under the rule of reason, plaintiffs must plead four separate elements. First, plaintiffs must plead facts which, if true, will prove "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Id.* at 1047; *see also Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1445 (9th Cir. 1988) (same). In addition to these elements, plaintiffs must also plead (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an "anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). This fourth element is generally referred to as "antitrust injury" or "antitrust standing." *See, e.g.*, *id.*

**[2]** In order to plead injury to competition, the third element of a Section 1 claim, sufficiently to withstand a motion to dismiss, "a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989). "Rather, a claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Id.*

---

enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)) (internal quotation marks omitted). The parties have disclaimed any contention that the tying practices in this case are per se antitrust violations.

at 508. Such allegations must "raise a reasonable expectation that discovery will reveal evidence of" an injury to competition. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Thus, a complaint's allegation of a practice that may or may not injure competition is insufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted)). In addition, plaintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).

**[3]** In sketching the outline of an injury to competition for purposes of this third element, the claimant must identify a contract, combination or conspiracy that has an anticompetitive effect. Courts have held that agreements between competitors in the same market (referred to as "horizontal agreements") may injure competition. For example, a horizontal agreement that allocates a market between competitors and "restrict[s] each company's ability to compete for the other's [business]" may injure competition. *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991). A horizontal agreement (either explicit or tacit) to set prices may injure competition because the result of such an agreement, "if effective, is the elimination of one form of competition," namely price. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 213-14 (1940) (quoting *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927)). Or a group of competitors may act in concert to harm another competitor or exclude that competitor from the market and thus "protect . . . dealers from real or apparent price competition" from the targeted competitor. *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146-47 (1966). Plaintiffs' complaint does not allege the existence of any horizontal agreements.

**[4]** Courts have also concluded that agreements between firms operating at different levels of a given product market (referred to as "vertical agreements"), such as agreements between a supplier and a distributor, may or may not cause an injury to competition. Vertical agreements that foreclose competitors from entering or competing in a market can injure competition by reducing the competitive threat those competitors would pose. Some types of vertical agreements can also injure competition by facilitating horizontal collusion. *See Leegin*, 551 U.S. at 893, 897-98. Other types of vertical agreements do not necessarily threaten an injury to competition. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-57 (1977) ("Such restrictions, in varying forms, are widely used in our free market economy" and "there is substantial scholarly and judicial authority supporting their economic utility.").

**[5]** The complaint in this case focuses on a type of vertical agreement that creates a restraint known as "tying." Tying is defined as an arrangement where a supplier agrees to sell a buyer a product (the tying product), but "only on the condition that the buyer also purchases a different (or tied) product . . . ." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). The potential injury to competition threatened by this practice is that the tying arrangement will either "harm existing competitors or create barriers to entry of new competitors in the market for the tied product," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984), *abrogated in part on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Cascade*, 515 F.3d at 912, or will "force buyers into giving up the purchase of substitutes for the tied product," *United States v. Loew's*, 371 U.S. 38, 45 (1962), *abrogated in part on other grounds by Ill. Tool Works*, 547 U.S. 28.

**[6]** But courts distinguish between tying arrangements in which a company exploits its market power by attempting "to impose restraints on competition in the market for a tied prod-

uct" (which may threaten an injury to competition) and arrangements that let a company exploit its market power "by merely enhancing the price of the tying product" (which does not). *Jefferson Parish*, 466 U.S. at 14. For example, in *Blough v. Holland Realty, Inc.*, we concluded that an alleged tying arrangement did not threaten an injury to competition. 574 F.3d 1084, 1088 (9th Cir. 2009). In that case, plaintiffs entered into contracts with defendant-homebuilders to purchase undeveloped lots plus newly constructed homes. In order to purchase the developed lots, plaintiffs were required to pay a percentage fee to defendant-realtors on top of the purchase price. *Id.* Plaintiffs alleged that the homebuilders were unlawfully tying the realtors' services to the sale of developed lots in violation of the Sherman Act. *Id.* We disagreed, holding that because the plaintiffs would not have otherwise purchased realtor services, the percentage fee was best viewed as part of the cost of purchasing the developed lot. *Id.* at 1090.

Further, market conditions may be such that a specific tying arrangement does not have anticompetitive effects. *See Driskill v. Dall. Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974). For example, in *Driskill*, the plaintiff alleged that defendant, the Dallas Cowboys, had unlawfully tied the sale of undesirable preseason tickets to the sale of season ticket packages. *Id.* at 322. But the court noted that the Dallas Cowboys had a lawful monopoly in the market for the tied product, preseason tickets, so the tying arrangement could not adversely affect competition in the tied product market; there was no competition to affect. *Id.* at 323. As the Supreme Court has noted, "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Jefferson Parish*, 466 U.S. at 16; *see also Blough*, 574 F.3d at 1090 ("'[W]here there is no competition in the tied market, there can be no antitrust violation.' "

(quoting *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006))).

Indeed, courts have noted that a tying arrangement may be a response to a competitive market rather than an attempt to circumvent it. *See Jefferson Parish*, 466 U.S. at 12 ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act."). Like other vertical restraints, tying arrangements may promote rather than injure competition. *See Continental*, 433 U.S. at 54-57 (1977) (identifying ways in which non-price vertical restraints may benefit competition); *Leegin*, 551 U.S. at 895-96 (noting that even though vertical price restraints can lead to higher prices, "prices can be increased in the course of promoting pro-competitive effects"). In *Continental*, the Supreme Court made clear that manufacturer-imposed vertical restraints, even when their "intent and competitive impact" is to "limit[ ] the freedom of the retailer to dispose of the purchased products as he desire[s]," are often pro-competitive. 433 U.S. at 46, 54-55. While such restraints limit intrabrand competition, they may increase interbrand competition, such as by "induc[ing] retailers to engage in promotional activities or to provide service[s]" that "might not be provided by retailers in a purely competitive situation." *Id.* at 55.

**[7]** Therefore, a plaintiff bringing a rule of reason tying case cannot succeed in stating the third element of a Section 1 claim merely by alleging the existence of a tying arrangement, because such an arrangement is consistent with pro-competitive behavior. *See Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1349 n.19 (9th Cir. 1982) ("[I]ntru[sion] upon consumers' freedom of choice by compelling the purchase of unwanted products . . . has been implicitly rejected by the Supreme Court as a sufficient independent basis for antitrust liability."). Rather, the plaintiff must allege an "actual adverse

effect on competition" caused by the tying arrangement. *Jefferson Parish*, 466 U.S. at 31.

**[8]** Plaintiffs may not substitute allegations of injury to the claimants for allegations of injury to competition. Plaintiffs must plead "antitrust injury," the fourth element necessary to state a Section 1 claim, in addition to, rather than in lieu of, injury to competition. *See Atl. Richfield*, 495 U.S at 334-35, 344. That is, in order to state a claim successfully, plaintiffs must allege both that defendant's behavior is anticompetitive and that plaintiff has been injured by an "anti-competitive aspect of the practice under scrutiny." *Id.* at 334 ("[I]t is inimical to the antitrust laws to award damages for losses stemming from continued competition." (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (1986))). Specifically, to plead this element, plaintiffs must allege facts that if taken as true would allow them to recover for "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (quoting *Atl. Richfield*, 495 U.S. at 334) (internal quotation marks omitted).

## III

We consider whether plaintiffs have stated a Section 1 claim in their third amended complaint in light of these principles. The key issue raised by this appeal is whether plaintiffs have adequately pleaded that the alleged Programmer-Distributor agreements actually injure competition.

There is no dispute that the complaint alleges the existence of a tying arrangement. In fact, according to the plaintiffs' complaint, the Programmer-Distributor agreements at issue consist of two separate tying arrangements. First, in the upstream market, each Programmer requires each Distributor that wishes to purchase that Programmer's high-demand channels (the tying product) to purchase all of that Program-

mer's low-demand channels (the tied product) as well.[8] Second, in the downstream market, Distributors sell consumers cable channels only in packages consisting of each Programmer's entire offering of channels. Thus, consumers, like Distributors, are allegedly required to purchase each Programmer's low-demand channels, which they do not want (the tied product), in order to gain access to that Programmer's high-demand channels, which they do want (the tying product).

But as explained above, tying arrangements, without more, do not necessarily threaten an injury to competition. Therefore, the complaint's allegations regarding the two separate tying arrangements do not, by themselves, constitute a sufficient allegation of injury to competition. Rather, plaintiffs must also allege facts showing that an injury to competition flows from these tying arrangements. We conclude that such allegations are not present in the complaint.

[9] First, it is clear that the complaint does not allege the types of injuries to competition that are typically alleged to flow from tying arrangements. The complaint does not allege that Programmers' practice of selling "must-have" and low-demand channels in packages excludes other sellers of low-demand channels from the market, or that this practice raises barriers to entry into the programming market.[9] Nor do the plaintiffs allege that the tying arrangement here causes consumers to forego the purchase of substitutes for the tied product. *Loew's*, 371 U.S. at 45. Nothing in the complaint indicates that the arrangement between the Programmers and

---

[8]We assume for purposes of this opinion, without deciding, that high-demand and low-demand channels are actually separate products, and do not address the question whether it is more apt to view each Programmer's block of channels as a single product, which would preclude any argument that there was an illegal tying arrangement.

[9]Thus, there is effectively "zero foreclosure" of competitors. *Blough*, 574 F.3d at 1090-91.

Distributors forces Distributors or consumers to forego the purchase of alternative low-demand channels. *Cf. id.* Indeed, Plaintiffs disavow any intent to allege that the practices engaged in by Programmers and Distributors foreclosed rivals from entering or participating in the upstream or downstream markets. *Cf. Jefferson Parish*, 466 U.S. at 14; *Cascade*, 515 F.3d at 912 ("Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product."). Nor does the complaint allege that the tying arrangements pose a threat to competition because they facilitate horizontal collusion. *See Leegin*, 551 U.S. at 893, 897-98.

**[10]** Instead of identifying such standard-issue threats to competition, the complaint alleges that the injury to competition stems from Programmers' requirement that channels must be sold to consumers in packages. According to the complaint, the required sale of multi-channel packages harms consumers by (1) limiting the manner in which Distributors compete with one another in that Distributors are unable to offer a la carte programming, which results in (2) reducing consumer choice, and (3) increasing prices. These assertions do not sufficiently allege an injury to competition for purposes of stating a Section 1 claim. First, because Section 1 does not proscribe all contracts that limit the freedom of the contracting parties, a statement that parties have entered into a contract that limits some freedom of action (in this case, by circumscribing the distributors' ability to offer smaller packages or channels on an unbundled basis) is not sufficient to allege an injury to competition. *See Continental*, 433 U.S. at 46, 54-55; *Bd. of Trade*, 246 U.S. at 238 ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence."). Businesses may choose the manner in which they do business absent an injury to competition.[10] *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555

---

[10]A rule to the contrary could cast doubt on whether musicians would be free to sell their hit singles only as a part of a full album, or writers to

U.S. 438, 448 (2009). Therefore, the mere allegations that Programmers have chosen to limit the ability of Distributors to offer Programmers' channels for sale individually does not state a cognizable injury to competition.

**[11]** Second, allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition. Both effects are fully consistent with a free, competitive market. *See Leegin*, 551 U.S. at 895-97; *Continental*, 433 U.S. at 55. Even vertical agreements that directly prohibit retail price reductions, eliminating downward competitive pressure on price and thereby resulting in higher consumer prices (commonly referred to as resale price maintenance agreements), are not unlawful absent a showing of actual anticompetitive effect. *See Leegin*, 551 U.S. at 895. As *Leegin* explained, higher consumer prices can result from pro-competitive conduct. *Id.* at 895-97. Had the plaintiffs succeeded in pleading an injury to competition, the complaint's allegations of reduced choice (due to the inability to purchase a la carte programming) and increased prices would sufficiently plead the fourth element of a Section 1 claim, namely that they had been harmed by the challenged injury to competition. But here, these allegations show only that plaintiffs have been harmed as a result of the practices at issue, not that those practices are anticompetitive.[11] Therefore, these allegations do

---

sell a collection of short stories. Indeed, such a rule would call into question whether Programmers and Distributors could sell cable channels at all, since such channels are themselves packages of separate television programs.

[11]Plaintiffs claim that *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1004 (9th Cir. 2008), supports their argument that reduced consumer choice and increased prices are sufficient to establish an injury to competition. Plaintiffs are mistaken: *Theme Promotions* held only that such injuries, when they are the result of an anticompetitive practice, constitute antitrust injury, not that any practice causing such harms was anticompetitive. Rather, the injury to competition in *Theme Promotions* was that plaintiff 's right-of-first-refusal agreements had "foreclosed competition in a substantial share of [the] market." *Id.* at 1001-03. The case is inapposite.

not, without more, allege an injury to competition "that is plausible on its face." *Twombly*, 550 U.S. at 570.

Plaintiffs disagree, and argue that under the rule in *Loew's,* 371 U.S. 38, and *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008), they have sufficiently alleged an injury to competition by alleging that the agreements have the effect of reducing choice and increasing prices. This argument is unavailing. In *Loew's*, the United States brought antitrust actions against six major film distributors, alleging that the defendants had conditioned the license or sale of one or more feature films upon the acceptance by television stations of a package or block containing one or more unwanted or inferior films. *Id.* at 40. The Court observed that the restraint injured competition because the movie studios' block booking forced the television stations to forego purchases of movies from other distributors. *Id.* at 49. The relevant injury in *Loew's* was to competition, not to the ultimate consumers, because the challenged practice forced television stations to forego the purchase of other movies, and therefore created barriers to entry for competing movie owners. *Cf. Jefferson Parish*, 466 U.S. at 14. Here, Plaintiffs have not alleged that the contracts between Programmers and Distributors forced either Distributors or consumers to forego the purchase of other low-demand channels (a result analogous to the competitive injury in *Loew's*), but only that consumers could not purchase programs a la carte and they did not want all of the channels they were required to buy from Distributors. "[C]ompelling the purchase of unwanted products" is not itself an injury to competition. *Hirsh*, 674 F.2d at 1349 n.19. We have explained why this is so:

> In order to obtain desired product A, let us suppose, the defendant's customer is forced to take product B, which it does not want, cannot use, and would not have purchased from anyone. This is typically the equivalent of a higher price for product A. From the viewpoint of the defendant seller, its revenue on

> product A consists of the A price plus the excess of the B price over B's cost to the seller. From the viewpoint of the customer, the cost of obtaining the desired product A is the nominal A price plus the excess of the B price over its salvage value. This has nothing to do with gaining power in the B market or upsetting competition there.

*Blough*, 574 F.3d at 1089-90 (quoting IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1724b, at 270 (2004 & Supp. 2009)); *see also Jefferson Parish*, 466 U.S. at 14 ("When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised."). Nor does plaintiffs' citation to *Ross* support their argument; that case involved allegations of horizontal collusion, which has not been alleged by plaintiffs in this case, and pertained to standing, not injury to competition. 524 F.3d at 223, 225.

[12] Plaintiffs also contend that because most or all Programmers and Distributors engage in the challenged practice, we should hold that in the aggregate, the practice constitutes an injury to competition. We cannot rule out the possibility that competition could be injured or reduced due to a widely applied practice that harms consumers. *See Leegin*, 551 U.S. at 897 (indicating that vertical restraints, such as resale price maintenance, "should be subject to more careful scrutiny" if the practice is adopted by many competitors). But the plaintiffs here have not alleged in their complaint how competition (rather than consumers) is injured by the widespread practice of packaging low- and high-demand channels.[12] The com-

---

[12]Indeed, because Plaintiffs' complaint alleges that the restraints at issue in this case were imposed by Programmers, not Distributors, *Leegin* suggests that any competitive threat is diminished. 551 U.S. at 898 ("If . . . a manufacturer adopted the policy independent of retailer pressure, the restraint is less likely to promote anticompetitive conduct.").

plaint did not allege that Programmers' sale of cable channels in packages has any effect on other programmers' efforts to produce competitive programming channels or on Distributors' competition as to cost and quality of service. Nor is there any allegation that any programmer's decision to offer its channels only in packages constrained other programmers from offering their channels individually if that practice was competitively advantageous. In sum, the complaint does not include any allegation of injury to competition, as opposed to injuries to the plaintiffs. *See also Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930-31 (4th Cir. 1990) (finding that aggregating a defendant's acts, none of which was anticompetitive individually, did not demonstrate an injury to competition).

IV

**[13]** Injury to competition must be alleged to state a violation of Sherman Act § 1. *Kendall*, 518 F.3d at 1047. Plaintiffs' complaint does not allege facts that "raise a reasonable expectation that discovery will reveal evidence of" injury to competition. *Twombly*, 550 U.S. at 566. Thus, plaintiffs' complaint did not allege facts that, taken as true, "state a claim to relief that is plausible on its face." *Id.* at 570. Dismissal was proper.

**AFFIRMED.**