# United States Court of Appeals for the Federal Circuit

---

**PONANI SUKUMAR, AN INDIVIDUAL, SOUTHERN CALIFORNIA STROKE REHABILITATION ASSOCIATES, INC., A CALIFORNIA CORPORATION,**

*Plaintiffs-Appellants*

v.

**NAUTILUS, INC., A WASHINGTON CORPORATION,**

*Defendant-Appellee*

---

2014-1205

---

Appeal from the United States District Court for the Western District of Virginia in No. 7:11-cv-00218-JCT, Senior Judge James C. Turk.

---

Decided: May 4, 2015

---

STEFFEN NATHANAEL JOHNSON, Winston & Strawn LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by GEOFFREY P. EATON; MICHAEL A. TOMASULO, Los Angeles, CA.

PATRICK J. KEARNS, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, San Diego, CA, argued for defendant-appellee. Also represented by ROBERT W. HARRISON.

---

Before PROST, *Chief Judge,* NEWMAN and REYNA, *Circuit Judges.*

PROST, *Chief Judge*.

Ponani Sukumar and Southern California Stroke Rehabilitation Associates, Inc. (collectively, "Sukumar") appeal from the district court's grant of summary judgment for Nautilus, Inc. ("Nautilus"). The district court held that Sukumar had not suffered "competitive injury" necessary to have standing to assert a false marking claim. *See* 35 U.S.C. § 292(b). The district court also granted summary judgment on Sukumar's state law unfair competition claims. We affirm.

## I. BACKGROUND

In 1994, Sukumar began caring for his aging father after Sukumar's father became ill and lost much of his mobility. Sukumar assisted his father with his rehabilitation, but, according to Sukumar, he noticed that the rehabilitation fitness machines used by his father did not adequately suit frail seniors. As a result, Sukumar resolved to learn more about rehabilitation for seniors, and he went to trade shows in the late 1990s where he met Nautilus representatives.

Soon afterward, in 1998 and 1999, Sukumar ordered Nautilus machines and asked for certain modifications to cater to elderly users' needs. When Nautilus delivered the custom fitness machines, Sukumar was dissatisfied, and Sukumar filed a breach of contract action against Nautilus and Med-Fit Systems, Inc., the distributor of the

products. That case was the first of several legal actions between Sukumar and Nautilus.[1]

In 2004, Sukumar founded Southern California Stroke Rehabilitation Associates ("SCSRA"), the other plaintiff in this action. Although somewhat unclear, SCSRA's business was likely to include opening and running the senior rehabilitation facilities in which Sukumar was to use modified Nautilus fitness machines. However, SCSRA's operations have been quite limited. SCSRA has acquired over 100 Nautilus fitness machines and, according to Sukumar's deposition testimony, SCSRA has twice attempted to negotiate a patent license from Nautilus. At least one of these license negotiations was proposed by Sukumar in settlement of litigation. Sukumar filed this case on October 21, 2010. As of that date, SCSRA had no business plan, no employees other than Sukumar, no office space, and no prototype designs.

On February 10, 2012, Sukumar moved for partial summary judgment on the issue of whether the Nautilus machines were falsely marked. The district court granted Sukumar's motion. Specifically, the district court found that eight of the twenty-four patents marked on the 2006 Nitro Plus Biceps Curl, the 2007 Nitro V-Triceps Extension, the 2008 F2 Lat Pulldown, the 2008 Studio Pec Fly, the 2009 One Triceps Press, and the 2009 XPLoad Compound Row did not cover the machines. In addition, eight of the sixteen patents marked on the 2006 Nautilus Commercial Series E916 Elliptical, 2006 Nautilus Commercial Series EV 916 Elliptical, and 2006 StairMaster StepMill 7000PT were found to not cover the machines.

---

[1]   The other legal actions are relevant because depositions and a settlement offer from those cases include evidence that contradicts portions of Sukumar's testimony in this case.

After the district court's partial summary judgment decision, Sukumar became substantially more active. Sukumar retained John Whitman to create a business plan for selling fitness equipment, hired a design firm to create initial renderings of a fitness machine, and consulted with engineers in the industry. At least as of August 2013, Sukumar was in talks to acquire land for offices and a manufacturing facility.

In the meantime, the law concerning who could bring an action for false marking had changed. On September 16, 2011, President Obama signed the America Invents Act ("AIA") into law. The AIA amended 35 U.S.C. § 292 to eliminate qui tam false marking suits and require that an entity suffer a "competitive injury" to bring a private right of action to enforce the false marking statute. America Invents Act, Pub. L. No. 112–29, § 16, 125 Stat. 282, 329 (2011). Soon after, this court held in a nonprecedential opinion that this amendment applied retroactively to a suit pending at the time the AIA was enacted. *See Rogers v. Tristar Prods., Inc.*, 559 F. App'x 1042, 1044 (Fed. Cir. 2012).

After a period of discovery to inform issues of standing and causation, the district court allowed a second round of summary judgment motions, and the parties brought cross-motions for summary judgment. On December 6, 2013, the district court granted Nautilus' motion for summary judgment on all claims and denied Sukumar's motion. Sukumar appeals.

## II. DISCUSSION

The district court's grant of summary judgment is reviewed de novo. *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012); *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1377 (Fed. Cir. 2006). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  We first consider Sukumar's false marking claim, followed by Sukumar's state law claims.

## A.  False Marking Claim

Title 35 section 292(a) prohibits, in part, "mark[ing] upon . . . in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public." 35 U.S.C. § 292(a).  Section 292(b) provides a private right of action to enforce § 292(a) to any "person who has suffered a competitive injury as a result of a violation of this section."  35 U.S.C. § 292(b).  The district court granted Nautilus summary judgment on Sukumar's false marking claim because it found that Sukumar had not suffered a competitive injury, and thus lacked standing to enforce § 292(a).

## 1.  The Competitive Injury Requirement

Section 292(b)'s "competitive injury" standing requirement was added in 2011 by the AIA.  The parties do not dispute that Sukumar was not selling products in competition with Nautilus at the time this suit was filed.[2] This case thus presents the question of whether (or to what extent) an entity that has not entered the relevant market can suffer "competitive injury."  Nautilus argues that an entity cannot suffer competitive injury unless it actively sells products in the market.  Sukumar contends that a potential competitor may suffer competitive injury

---

[2]    A plaintiff must possess standing as of the time the suit was filed.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).

if it intends to enter the market. We hold that a potential competitor may suffer competitive injury if it has attempted to enter the market. An attempt is made up of two components: (1) intent to enter the market with a reasonable possibility of success, and (2) an action to enter the market.[3]

This court has yet to address the meaning of "competitive injury," so we begin with its plain meaning. Black's Law Dictionary defines "competitive injury" as "[a] wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition; a disadvantage in a plaintiff's ability to compete with a defendant, caused by the defendant's unfair competition." Black's Law Dictionary (9th ed. 2009). This definition, while hardly conclusive, lends some support for Sukumar's position. A potential competitor would generally not be considered a "commercial rival," but a potential competitor may suffer "a disadvantage in [its] ability to compete" if another's actions impair its ability to enter the market. Still, this definition does not include all potential competitors. To suffer a disadvantage in the "ability to compete," an entity must have some present ability to compete—if only in part—that is disadvantaged. Therefore, Black's Law Dictionary defines "competitive injury" to encompass some potential competitors, but only those that suffer "a disadvantage in [their] ability to compete."

---

[3]   Satisfaction of this competitive injury requirement, however, does not mean that a party necessarily has standing under § 292(b). The statute also imposes a causation requirement. Standing under § 292(b) is limited to those who have suffered a competitive injury "as a result of a violation of [section 292(a)]." 35 U.S.C. § 292(b).

Because the text of the statute is inconclusive, we next consider the legislative history. The House of Representatives' report on the AIA provides the most succinct summary of congressional intent with respect to the amendments to § 292. The report notes a recent "surge in false-marking qui tam litigation" and explains that most of the new suits involve a product that was originally properly marked, but no longer was once the patent expired. H.R. Rep. 112-98, 53, 2011 U.S.C.C.A.N. 67, 84. According to the report, "[i]t is doubtful that the Congress that originally enacted this section anticipated that it would force manufacturers to immediately remove marked products from commerce once the patent expired, given that the expense to manufacturers of doing so will generally greatly outweigh any conceivable harm of allowing such products to continue to circulate in commerce." *Id.* The report concludes that

> [t]o address the recent surge in litigation, the bill replaces the qui tam remedy for false marking with a new action that allows a party that has suffered a competitive injury as a result of such marking to seek compensatory damages. The United States would be allowed to seek the $500-per-article fine, and competitors may recover in relation to actual injuries that they have suffered as a result of false marking, but the bill would eliminate litigation brought by unrelated, private third parties.[4]

---

[4] Congress explicitly preserved the ability to seek a $500-per-article fine in § 292(a), but limited enforcement to the government. As such, the statute uses the threat of a government suit—rather than the previous mechanism of qui tam actions—to deter businesses from falsely marking their products.

*Id.*

Nautilus seizes on the language that "competitors may recover in relation to actual injuries that they have suffered as a result of false marking" to argue that only current market participants have standing to bring a false marking action. But the use of the word "competitors" just begs the question of what "competitors" means. In the same sentence, the report juxtaposes "competitors" with "unrelated, private third parties." Entities actively attempting to enter the market are not "unrelated, private third parties." As such, the legislative history is inconclusive.

Another source to inform the meaning of "competitive injury" is the term's use in analogous areas of law. Although the phrase is not identical, "injury to competition" is a common concept in antitrust law. *See, e.g.*, *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 488 (8th Cir. 1985); *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 498 (10th Cir. 1983). In that context, preventing market entry unquestionably qualifies as "injury to competition." For example, the Supreme Court has held that injury to competition includes "creat[ing] barriers to entry of new competitors in the market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984), *abrogated in part on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). In addition, the Ninth Circuit has stated that "[v]ertical agreements that foreclose competitors from entering or competing in a market can injure competition by reducing the competitive threat those competitors would pose." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012). Similarly, on another occasion the Ninth Circuit has reasoned that "[t]ying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude

other sellers of the tied product." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).

We also find persuasive Sukumar's argument that "competitive injury" in § 292 must include what is arguably the most egregious type of competitive injury: the prevention of market entry altogether. The rule Nautilus proposes would exclude this important circumstance. Indeed, competition is certainly harmed when a market participant's false marking deters a would-be competitor from attempting to enter the market. This was recognized as one of the original rationales for allowing qui tam actions to remedy false marking. *See Forest Grp., Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1303 (Fed. Cir. 2009) ("If an article that is within the public domain is falsely marked, potential competitors may be dissuaded from entering the same market."). The AIA's removal of qui tam claims for false marking did not indicate disapproval of this rationale. Rather, the AIA recalibrated the enforcement mechanism for false marking in response to a flood of false marking claims that did little to achieve the original objective of minimizing anticompetitive conduct.

From the above review of the statutory text, legislative history, analogous areas of law, and policy rationale, we conclude that § 292(b) extends standing to sue for a violation of § 292(a) to some potential competitors. Nevertheless, it is equally clear that the amended statute does not confer standing upon any entity that claims a subjective intent to compete. Rather, § 292 limits standing to entities that have "suffered a competitive injury as a result of a violation of [section 292(a)]." A potential competitor can only suffer a *competitive* injury if it engages in competition. Dreaming of an idea but never attempting to put it into practice is insufficient. Otherwise, market entry is too speculative and, thus, competition cannot be harmed by the false marking. Likewise, sometimes a falsely marked product is also properly marked with other patents. In that case, a potential competitor

must show that the falsely marked patents deterred market entry, but that—for some reason—the properly marked patents did not deter market entry. Therefore, an injury is only a "competitive injury" if it results from competition, and a potential competitor is engaged in competition if it has attempted to enter the market, which includes intent to enter the market and action to enter the market. And, for the sake of completeness, an entity has standing under § 292(b) if it can demonstrate competitive injury that was caused by the alleged false marking.

2. Application to Sukumar

a. Intent to enter the market

Sukumar alleges that he developed the intent to compete with Nautilus in the mid- to late-1990s. Nautilus responds that Sukumar never intended to sell fitness machines in competition with Nautilus, and that, if anything, Sukumar intended to operate senior rehabilitation centers. According to Nautilus, these rehabilitation centers would use modified Nautilus fitness machines, which would make Sukumar a customer of Nautilus', not a competitor.

To support his argument, Sukumar cites his declaration, which was prepared for the purposes of summary judgment; the summary judgment declaration of Frank Smith, a former Nautilus employee hired as a consultant by Sukumar; and some excerpts of Sukumar's deposition testimony in this case. These three sources claim that, beginning in the late 1990s, Sukumar intended to modify Nautilus machines and sell the modified machines in competition with Nautilus.

The district court properly found that other evidence, including nearly all of the objective evidence, tends to support Nautilus. *Sukumar v. Nautilus, Inc.*, No. 7:11-CV-00218, 2013 WL 6408351, at *10–12 (W.D. Va. Dec. 6, 2013). In 1998 and 1999, Sukumar placed orders for

custom Nautilus fitness machines with certain modifications requested by Sukumar. When Sukumar was dissatisfied with the machines Nautilus eventually delivered, he commenced litigation against Nautilus. There is no evidence that Sukumar intended to mass produce the designs Nautilus produced for him in competition with Nautilus.

Several years later, in 2004, Sukumar incorporated SCSRA. It is unclear what, if any, business activities SCSRA or Sukumar undertook with respect to the fitness machines market over the next half-decade apart from litigating against Nautilus and purchasing several modified fitness machines from a company called MedX Corporation. Both parties direct the court to a litigation settlement proposed by Sukumar as evidence of Sukumar's intent during this time. In this settlement proposal, which Sukumar communicated to Nautilus in 2009, Sukumar attempted to negotiate a license to Nautilus patents. The license offer explained that Sukumar and Southern California Stroke Rehabilitation Associates, Inc. were "interested in developing and operating a series of rehabilitation centers that would provide physical therapy and other rehabilitation services to stroke victims and patients suffering from stroke-like symptoms." The proposed patent license extended only for Sukumar "to make and have made for use exclusively in Sukumar-owned rehabilitation centers equipment and parts that are covered by a claim of Nautilus' patent rights."

The district court also noted that the bulk of Sukumar's testimony confirms that Sukumar's intent was always to use modified fitness machines in senior rehabilitation and spa centers. *Id*. at *12. At his deposition in this case, Sukumar spoke at length about his plans to devote SCSRA to open senior rehabilitation centers and senior spa centers. *Id*. In addition, the district court found that this testimony comports with testimony Sukumar has given in previous cases between the parties.

*Id.* at *11. For example, in another lawsuit Sukumar testified that SCSRA would have started senior rehabilitation centers were it not for Nautilus' failure to provide Sukumar seven fitness machines.

In response to this glut of evidence, Sukumar points to numerous activities he has undertaken since the district court found that some of Nautilus' machines were falsely marked as evidence of his earlier intent to compete with Nautilus. As an example, Sukumar has recently commissioned the development of a business plan and design of a prototype, and engaged in discussions to purchase land for a manufacturing facility. However, the district court did not err in finding that this evidence has minimal probative value for several reasons. *See id.* at *11, *11 n.14, *12. First, crediting it would allow parties in litigation to manufacture evidence after the suit has been filed. Second, in this case Sukumar's logic makes little sense. Sukumar says he was deterred from entering the market by Nautilus' patent labels. Apparently now that a court has confirmed that some of the patent labels on some of Nautilus' machines were inappropriate, Sukumar is no longer deterred, even though the vast majority of Nautilus' machines—including all those released prior to 2006—have not been adjudicated as falsely marked.

In sum, we agree with the district court that Sukumar's evidence of his intent to compete with Nautilus is weak. Sukumar and Frank Smith's assertions as to Sukumar's subjective intent are contradicted by Sukumar's statements in both this case and others. The documentary evidence suggests that Sukumar intended only to open senior rehabilitation centers, which would not operate in competition with Nautilus. Still, on summary judgment, as did the district court, we must view the evidence in the light most favorable to Sukumar. Therefore, we must consider the second component of an at-

tempt to enter the market: whether Sukumar took action to enter the market.

### b. Action to enter the market

Consistent with the district court, we conclude that, even if Sukumar subjectively intended to enter the market for fitness machines, he took insufficient action to pursue that intent. *See id.* at *10–12. Thus, no genuine issue of material fact remains—Sukumar did not attempt to compete with Nautilus, so Sukumar did not suffer a competitive injury. Sukumar possesses a Master of Business Administration degree and previously held a career as an investment banker. Sukumar has little to no engineering knowledge of fitness machines or business experience in the fitness machine market. Sukumar contends that, to gain familiarity with Nautilus fitness machines, he purchased over 100 exercise machines from Nautilus. But Sukumar's alleged attempt to compete with Nautilus ends here. Sukumar placed the Nautilus machines he purchased in storage for years. And despite the fact that over a decade passed between when Sukumar claims he developed the intent to compete with Nautilus and when Sukumar filed this case, the list of basic steps Sukumar did not take is long:

Sukumar did not develop a business plan.

Sukumar did not attempt to design a prototype.

Sukumar did not hire any employees.

Sukumar did not gain engineering knowledge.

Sukumar did not investigate developing manufacturing capacity.

As the district court noted, the undisputed evidence establishes that, at the time Sukumar filed the suit, Sukumar had not taken sufficient action to enter the market for fitness machines. *Id.* at *10. Therefore, Sukumar was not engaged in competition with Nautilus

and did not suffer a competitive injury. Accordingly, the district court properly granted summary judgment for Nautilus because Sukumar lacks standing to bring a claim for false marking under § 292.

## B.  State Law Claims

Sukumar also appeals the district court's grant of summary judgment for Nautilus on Sukumar's unfair competition claims, which were brought under Washington and California law. Sukumar contends that the district court applied the wrong causation standard to the state law claims. Specifically, Sukumar argues that the district court required Nautilus' false marking to be the sole cause of his damages, rather than an "immediate cause" (the standard in California) or a "but-for cause" (the standard in Washington).

In arguing that the district court applied the wrong legal standard for causation, Sukumar cites a single sentence from the district court's opinion: "It simply defies common sense to conclude that, for more than ten years, Plaintiffs have not entered the market to compete with Nautilus and that the sole item holding them back was their fear of infringing patents that were falsely listed on the accused machines' patent labels." *Id*. Apparently based on the district court's usage of the word "sole" in one sentence, Sukumar contends that the district court employed an improperly stringent causation standard throughout the district court's entire twenty-eight page opinion.

Sukumar takes a single word of the district court's opinion out of context. The district court used the word "sole" for emphasis in demonstrating the absurdity of Sukumar's causation claim. While the district court's particular word choice in that sentence may be imprecise, it does not negate the district court's two-page recital of what even Sukumar admits is the correct law. Nor does a single use of the word "sole" nullify the district court's

faithful application of the correct law throughout the rest of the opinion.

Furthermore, as to Sukumar's argument that Nautilus' false marking caused his alleged damages, we agree with the district court that Sukumar does not present sufficient evidence. For example, the district court found that "Sukumar has repeatedly blamed other actions of Nautilus—not any false patent labels—for the years of delay in accomplishing his business objectives and he has done so both in prior litigation and in his deposition in this case." *Id.* at *11. Such actions include Nautilus' alleged "unwillingness or inability to provide satisfactorily-modified equipment" to Sukumar and "oral representations by Nautilus regarding patent protection generally on its machines." *Id.* at *11, *13. We also note that Sukumar never attempted to develop a capacity to enter the market. As discussed above, the district court properly found that Sukumar's intent was to open senior rehabilitation and spa centers, not to compete with Nautilus. *Id.* at *11–12. Finally, at bottom, Sukumar cannot create a genuine issue of material fact by simply submitting a conclusory declaration against overwhelming evidence to the contrary. *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements."). Thus, the district court did not err in granting summary judgment for Nautilus on Sukumar's state law claims.

## III. CONCLUSION

Accordingly, we affirm the district court's grant of summary judgment for Nautilus on Sukumar's false marking and state law claims.

## AFFIRMED